Billy WILLIAMS, Petitioner,

v.

Charles L. WOLFF, Jr., and Attorney General of the State of Nevada, Respondents.

No. CIV–R–79–252–ECR.

United States District Court, D. Nevada.

June 24, 1980.

Billy Williams, pro se.

Richard H. Bryan, Atty. Gen., Carson City, Nev., Calvin R. X. Dunlap, Dist. Atty. of Washoe County, Jerry H. Mowbray, Deputy Dist. Atty., Reno, Nev., for respondents.

## MEMORANDUM DECISION

EDWARD C. REED, Jr., District Judge.

The petitioner, a prisoner of the State of Nevada, has petitioned for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

He was convicted by a jury in 1968 of a robbery that occurred in Reno, Nevada, on September 6, 1967, and sentenced to life imprisonment as an habitual criminal. The Nevada Supreme Court affirmed the conviction and sentence in *Williams v. State*, 85 Nev. 169, 451 P.2d 848 (1969), cert. den. 396 U.S. 916, 90 S.Ct. 239, 24 L.Ed.2d 194 (1969).

Petitioner Williams then sought a writ of habeas corpus in this United States District Court. Denial of the writ was affirmed in *Williams v. Hocker*, 463 F.2d 234 (9th Cir. 1972). However, the Ninth Circuit's opinion declared that the record before the state court contained substantial evidence which raised serious doubt about Williams' mental competency. It suggested presenting that matter to the Nevada courts.

A petition to a Nevada district court for a writ of habeas corpus then was denied. However, the Nevada Supreme Court reversed, ordering Williams discharged from confinement unless the State elected within a reasonable time to retry him. *Williams v. Warden, Nevada State Prison*, 91 Nev. 16, 530 P.2d 761 (1975). The opinion required a prior special hearing to determine mental competency to stand trial, if the State should elect a retrial.

The State did elect to retry Williams. However, the proceedings were stayed pending resolution of the competency issue. On December 19, 1975, a State district court judge ruled that Williams was competent to stand trial. A trial was held and the jury convicted him of robbery on January 7, 1976. Williams again was sentenced to a term of life imprisonment as an habitual criminal, on February 3, 1976. Upon appeal, the Nevada Supreme Court affirmed. *Williams v. State*, 93 Nev. 405, 566 P.2d 417 (1977). The instant petition for a writ of habeas corpus, then, must attack the 1976 conviction and sentence. The petition alleges six grounds for relief:

1. The three prior convictions used to invoke the habitual criminal life sentence were constitutionally infirm, according to Williams. He contends that a 1952 California burglary conviction was entered without his being represented by counsel. A 1960 Ohio conviction was for operating a vehicle without the owner's consent. Williams argues that such offense is not a felony within the contemplation of Nevada's Habitual Criminal Act (NRS 207.010), which requires that the defendant ". . . shall previously have been three times convicted, whether in this state or elsewhere, of any crime which under the laws of the situs of the crime or of this state would amount to a felony, . . . ." Further, the petitioner complains that the Ohio judgment of conviction is unconstitutional on its face in that it reflects conviction for operating a motor vehicle without consent, yet the sentence imposed was for robbery. The third prior conviction, in Kansas in 1961 for grand larceny, was not a

126

felony under the Habitual Criminal Act, either, in Williams' view.

■ It is well established that recidivist statutes and enhanced sentence laws are constitutionally permissible. *Spencer v. Texas*, 385 U.S. 554, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967). Nevada's habitual criminal law has been upheld against constitutional attack. *McGarry v. Fogliani*, 370 F.2d 42 (9th Cir. 1966).

■ Under Nevada law, admission into evidence of an exemplified copy of a felony conviction is prima facie evidence of conviction of a prior felony (NRS 207.010(8)) and of the type of prior felony, where committed, identity of the sentencing court, whether defendant was represented by counsel, etc. *Anglin v. State*, 86 Nev. 70, 464 P.2d 504 (1970). The *Anglin* opinion declares that the court may rely upon the exemplified record and make its determination to enhance punishment therefrom, unless a constitutional infirmity appears from the face of the record. On the other hand, if a prior conviction is constitutionally infirm, but such infirmity is not reflected upon the face of the exemplified record, ". . . that infirmity is to be established through an appropriate proceeding in the state where the conviction occurred and not otherwise. Until it is thus established the forum court may rely upon the exemplified record." Id., at 464 P.2d 506.

The exemplified record of the Superior Court of the State of California, in and for the County of Yolo, reveals that petitioner Williams was represented by attorney Thomas E. Reynolds when judgment of conviction on three counts of first degree burglary was entered on July 14, 1952. Said judgment was entered upon Williams' pleas of guilty. Mr. Reynolds is identified in the record as Public Defender of Yolo County.

The exemplified record from the Court of Common Pleas, Ottawa County, Ohio, reveals that petitioner Williams in September 1960 was charged with robbery and with operating a motor vehicle without the owner's consent. Attorney Myron Rosentreter was appointed to represent Williams. Sub-sequently Williams, in open court and with said counsel present, pleaded guilty to violation of Ohio Revised Code § 4549.04 (operating a motor vehicle without the consent of the owner). He was sentenced for said crime to a term of not less than one nor more than twenty years, pursuant to Ohio Revised Code § 4549.99. That Code section sets forth the penalties for violations of various sections of the Ohio Criminal Code, including § 4549.04. The one–to–twenty year term conformed with the penalties statute's provisions applicable to a felony, as contrasted to joyriding penalties.

■ The robbery charge was "nollied" on the recommendation of the prosecuting attorney. Robbery, in Ohio, is a felony of the second degree. Ohio Revised Code § 2911.-02. The penalty for a felony of the second degree is a minimum term of two, three, four or five years (the choice to be made by the trial court), and a maximum term of fifteen years. Ohio Revised Statutes § 2929.11. It is, therefore, apparent from the record that petitioner Williams was sentenced for operating a motor vehicle without the consent of the owner, and not for robbery. Further, the crime for which he was sentenced would amount to a felony in the State of Nevada. NRS 193.120; NRS 205.220; *Holbrook v. State*, 90 Nev. 95, 518 P.2d 1242 (1974).

■ Petitioner Williams pleaded guilty to grand larceny in the District Court of Reno County, Kansas, on December 8, 1961. His attorney, John K. Leighnor, was present when he so pleaded. Grand Larceny amounts to a felony in Nevada. NRS 205.-220; NRS 193.120.

■ From the foregoing it is concluded that the legality of the sentencing of the petitioner as an habitual criminal is supported by the record.

2. The petitioner contends that he had served the maximum statutory penalty for robbery pursuant to his 1968 conviction before he was retried in 1976. Therefore, he argues, the retrial violated the double jeopardy provision of the Fifth Amendment to the U.S. Constitution.

■ The punishment for robbery is ". . . imprisonment in the state prison for not less than 1 year nor more than 15 years." NRS 200.380. Accordingly, the maximum term for Williams' 1968 conviction was fifteen years. He correctly contends that he must be credited with any good time he had earned in determining whether he had fully served the sentence at the time of the retrial. See NRS 213.-1099(2) and 209.433. The latter section specifies the amounts of good time credits that could be earned by prisoners sentenced on or before June 30, 1969. (The petitioner was sentenced on March 6, 1968). His retrial commenced January 5, 1976. Thus, he had served slightly less than eight years. The record does not show how much good time credit had been earned, but even if he was entitled to the maximum possible, his sentence would not have been satisfied. Using the schedule of credits set out in NRS 209.433, if he had served a full eight years, the maximum credit he could have earned would have been two years and eight months. Accordingly, the total of his actual time served and good time credits could not have exceeded ten years and six months at the time of the retrial. This would not have satisfied the sentence of one–to–fifteen years set by statute.

■ When an appellant obtains a reversal of a prior, unsatisfied conviction, he may be retried in the normal course of events. *United States v. Ewell*, 383 U.S. 116, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966). The successful appeal of a judgment of conviction, on any ground other than the insufficiency of the evidence to support the verdict, poses no double jeopardy bar to retrial on the same charge. *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); *United States v. Scott*, 437 U.S. 82, 98 S.Ct. 2187, 57 L.Ed.2d 65 (1978). The reversal of Williams' 1968 conviction and sentence was based upon his entitlement to a hearing concerning his mental competency, and not because of insufficiency of the evidence. *Williams v. Warden, Nevada State Prison*, 91 Nev. 16, 530 P.2d 761 (1975).

Thus, the retrial of the petitioner in 1976 did not violate his constitutional protection against being placed in double jeopardy.

3. The petitioner asserts that the procedure which led to his identification by the robbery victim was unconstitutional. Williams alleges that the initial confrontation took place at the preliminary hearing held on October 9, 1967, where he was required to don clothes allegedly worn by the robber during the commission of the crime. Among the items of apparel he had to put on was a ski cap which covered his entire head and face except for a slit over the eyes. A substantially similar procedure was used at the petitioner's 1968 trial, according to Williams. The victim, Mr. E. Frandsen Loomis, identified him as the robber both times.

■ Where the initial confrontation, for identification purposes, between a witness and the accused is conducted in such a manner as to be unnecessarily suggestive and conducive to irreparable mistaken identification, there is a denial of due process. *Houston v. Nelson*, 404 F.Supp. 1108 (C.D. Cal.1975). What is sought to be avoided is a proceeding where the law enforcement officials encourage or suggest that the witness identify the accused as the offender. After such an identification there is the likelihood that in any future identifications, such as during trial, the witness will really be identifying the person pointed out at the initial confrontation, rather than the person seen at the scene of the crime.

The issue is discussed in *Manson v. Braithwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). The opinion states that the central issue is whether, under the totality of the circumstances, the identification was reliable even though the confrontation procedure was suggestive. The admission of testimony concerning a suggestive and unnecessary identification procedure does not violate due process so long as the identification possesses sufficient aspects of reliability. Manson lists as factors to be considered, as to reliability, the following:

(a) The opportunity of the witness to view the criminal at the time of the crime;

(b) The witness' degree of attention;

(c) The accuracy of the witness' prior description of the criminal;

(d) The level of certainty demonstrated at the confrontation; and

(e) The amount of time elapsing between the crime and the confrontation.

Mr. Loomis testified that about 8:30 in the evening of September 6, 1967, he and his wife and two sons were lying on two beds in a bedroom of their home, watching television. At the time, there was no lighting in the room except that emanating from the television set itself. The robber appeared in the doorway, carrying a pistol. He ordered the four members of the Loomis family to lie on the floor. There was a problem as to space because one son was wearing a football uniform with pads. The robber allowed that son to get up. Mr. Loomis continually watched the robber. When the robber demanded money, Mr. Loomis arose, got his trousers from a chair, and threw them to the robber. Then Mr. Loomis was told to open the safe. Three lights were turned on so that he could comply.

The police were called about a minute after the robber had left. Mr. Loomis told the police that the robber was a short black man weighing about one hundred twenty-five pounds. He described the robber as having worn a ski mask, a light shirt, a dark coat and a pair of light colored pants that were rather large and baggy.

The preliminary hearing at which Mr. Loomis first confronted Williams was held October 9, 1967, which was thirty-three days after the robbery. There Mr. Loomis stated that he "believed" Williams to be the robber and the clothes donned by Williams to be "similar" to those worn by the robber. Later he declared of Williams that: "He appears to be identical" to the robber. He particularly noted the robber's squinty eyes and flattened nose.

The constitutional guarantee against self–incrimination protects an accused only from being compelled to testify against himself or otherwise provide the State with evidence of a testimonial or communicative nature. *Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972). Therefore, it is constitutionally permissible to require an accused to put on clothing allegedly worn by the criminal during the perpetration of the crime. This applies to stocking masks (*United States v. Lamb*, 575 F.2d 1310 (10th Cir. 1978), cert. den. 439 U.S. 854, 99 S.Ct. 165, 58 L.Ed.2d 160 (1978); *United States v. Roberts*, 481 F.2d 892 (5th Cir. 1973)), hats (*United States v. Bridgefourth*, 538 F.2d 1251 (6th Cir. 1976); *United States v. Wilcox*, 507 F.2d 364 (4th Cir. 1974), cert. den. 420 U.S. 979, 95 S.Ct. 1408, 43 L.Ed.2d 661 (1975)); *United States v. Crouch*, 478 F.Supp. 867 (E.D.Cal.1979)), coats (Id.), scarves (*United States v. Gaines*, 450 F.2d 186 (3rd Cir. 1971), cert. den. 405 U.S. 927, 92 S.Ct. 978, 30 L.Ed.2d 801 (1972)), and sunglasses (*United States v. Wilcox*, supra). An accused may even be required to shave. *United States v. O'Neal*, 349 F.Supp. 572 (N.D.Ohio 1972), aff'd on other grounds 496 F.2d 368 (6th Cir. 1974). Thus, requiring Williams to put on the clothes allegedly worn by the robber is not a ground for relief.

The fact that an identification is less than positive does not render it inadmissible. *Frank v. Blackburn*, 605 F.2d 910 (5th Cir. 1979), rehearing en banc granted 610 F.2d 383 (5th Cir. 1980). Unless there is a substantial likelihood of irreparable misidentification, the weight to be given the identification is for the jury. *Manson v. Braithwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). These principles would seem to be controlling here. There was no error in compelling Williams to wear the robber's clothes. Under the totality of the circumstances, Mr. Loomis' identifications of Williams possess aspects of reliability. If there was error in the identification procedure, I believe it was harmless beyond a reasonable doubt.

4. During closing argument the prosecuting attorney, Robert H. Perry, Esq., attempted to explain why Williams, when apprehended, had none of the currency taken by the robber. Mr. Perry suggested there may have been an accomplice, with the accomplice receiving the currency (about $120) and Williams retaining the coins (about $100) taken from the Loomises. The court reporter's transcript, on page 266, discloses the following was said, Mr. Perry being the first speaker:

"The only thing that the state didn't do in this case, that the police didn't do—and they did a good job in this case—is they didn't catch him before he got rid of the money, before he got rid of the currency.

"I don't think he threw it away, ladies and gentlemen. This man is from Oakland. How did he know about Mr. Loomis, a wealthy attorney who lives in a secluded area of this community? How did he find his house and how did he know how to get into the house and how did he know about the safe in that house and how did he know that Mr. Loomis owned businesses in this town, in addition to being a practicing attorney that he owned that garage over there and kept all that money in his house, a man from Oakland?

"I don't think he threw that currency away, ladies and gentlemen. You can reach your own conclusions about who got that currency or where it went but that's the only thing that we haven't been able to show you in this case and there's only one person in this courtroom who knows for sure where that money went, where that currency went, and it is this man seated right here in that yellow coat.

"THE DEFENDANT: Object.

"THE COURT: All right. Counsel, you may continue.

"MR. PERRY: Thank you.

"Now, we can't present that currency, we can't tell you where it went because we don't know. You consider all the evidence, where this man is from, how he knew about that house and all those particular things and determine whether or not you think that he did this by himself." (Emphasis added).

The man seated in the yellow coat was Mr. Williams. He contends that the underlined portion of the prosecutor's argument constituted improper comment on his (Williams') failure to testify during the trial.

■ The Fifth Amendment, as to the federal government, and the Fourteenth Amendment, as to the states, forbids comment by the prosecution on the accused's exercise of his right to remain silent. *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Hayes v. United States*, 368 F.2d 814 (9th Cir. 1966); *United States v. Parker*, 549 F.2d 1217 (9th Cir. 1977).

It must be noted, in the foregoing quotation, that it was the defendant himself, and not his attorney, who objected to the allegedly improper comment of the prosecutor. The Nevada Supreme Court declined to consider the issue on the merits, because the ". . . alleged improper argument was not objected to . . . ." *Williams v. State*, 93 Nev. 405, 566 P.2d 417, 419 (1977). The basic reason for the contemporaneous objection rule is to bring the purported error in the proceedings to the attention of the trial judge, so that he may prevent or remedy any unfairness right there and then. While technically the defendant himself is not supposed to make objections when he is represented by an attorney, it does seem that Williams' objection did bring the prosecutor's comment to the attention of the trial judge. Apparently neither the defendant's counsel nor the judge felt that the comment was objectionable.

■ The federal harmless and plain error rule (Fed.R.Cr.P. Rule 52) is applicable in habeas corpus proceedings. *Leavitt v. Howard*, 332 F.Supp. 845 (D.R.I.1971), rev'd on other grounds 462 F.2d 992 (1st Cir. 1972), cert. den. 409 U.S. 884, 93 S.Ct. 175, 34 L.Ed.2d 140 (1972). Rule 52(b) provides that plain errors affecting substantial

rights may be noticed although they were not brought to the attention of the trial court. However, plain error won't ordinarily be found when the evidence against a defendant is so strong that the jury's verdict would have been the same even if there had been no prosecutorial misconduct. *United States v. Giese*, 597 F.2d 1170 (9th Cir. 1979), cert. den. 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 405 (1979). This is in line with the general rule that Rule 52(b) should be invoked only where necessary to prevent a miscarriage of justice. *Marshall v. United States*, 409 F.2d 925 (9th Cir. 1969). The comment of the prosecutor fails to constitute a "plain error" under either standard.

■ Comment on the defendant's failure to testify is reversible error where the comment is extensive, where an inference of guilt from silence is stressed to the jury as a basis for conviction, and where there is evidence that could have supported acquittal. *Anderson v. Nelson*, 390 U.S. 523, 88 S.Ct. 1133, 20 L.Ed.2d 81 (1968); *United States v. Sigal*, 572 F.2d 1320 (9th Cir. 1978); *United States v. Parker*, 549 F.2d 1217 (9th Cir. 1977). Here, the prosecutor's comment was not extensive, no inference of guilt from silence was stressed to the jury, and no substantial evidence was presented to the jury that would have supported a judgment of acquittal. The defendant presented no witnesses.

An analogous situation arose in *Jacobs v. United States*, 395 F.2d 469 (8th Cir. 1968). There, in his rebuttal argument, the prosecuting attorney declared that both merchandise and money were missing–"And there are only four people in this room that know–just four–and they are not about to tell us." (Id., at 477). The defendants had argued, as in the Williams case, that the government had failed to establish where the missing property had gone. The opinion holds that the prosecution may properly call attention to the lack of evidence on the question of where the property went, although it would be improper to comment on the failure of the defendant to provide such evidence. The prosecutor's comment was held to be legitimate rebuttal to the argument of defendants' counsel that the government had failed to establish where the missing property had gone.

■ In the instant action the trial court instructed the jury:

"The defendant has a right under the constitution and laws of this State to remain silent and no inference of his guilt or innocence can be drawn therefrom.

"The defendant does not have to prove himself innocent, the State has the burden of proving the guilt of the defendant."

Such instructions tend to cure an improper comment by the prosecutor. *United States v. Jones*, 459 F.2d 47 (9th Cir. 1972); *United States v. Estrada de Castillo*, 549 F.2d 583 (9th Cir. 1976). Even more in point is the holding in *United States v. Smith*, 441 F.2d 539 (9th Cir. 1971) that where the prosecutor's comments are ambiguous, any error remaining after the court properly instructs the jury that no inference may be drawn from the defendant's failure to take the stand is harmless beyond a reasonable doubt.

■ Where the evidence of the defendant's guilt is overwhelming, an improper comment by the prosecution in final argument may be deemed harmless beyond a reasonable doubt. *Favors v. Eyman*, 466 F.2d 1325 (9th Cir. 1972); *United States v. Fernandez*, 497 F.2d 730 (9th Cir. 1974), cert. den. 420 U.S. 990, 95 S.Ct. 1423, 43 L.Ed.2d 670 (1974). In addition to the description of the robber by Mr. Loomis and said victim's identification of Williams, described above, evidence in the record of this case reflects that within fifteen minutes after the robbery, the police dispatcher broadcast the description of the robber provided by Mr. Loomis. Shortly thereafter two officers patrolling some four blocks from the Loomis residence observed a short black man walking down the street carrying a valise. One of the officers asked for identification and was told by the individual that he had none. When asked where he came from, the black man replied, "Oakland." Then he jumped to the right and pulled a weapon. Shots were exchanged

and one of the officers fell wounded. The suspect fled the scene, leaving his valise behind.

The gunfire attracted a member of the sheriff's department. He inventoried the contents of the valise. In it were the clothes described by Mr. Loomis as having been worn by the robber. It also contained one black and one brown shoe. When Williams was later arrested, he was wearing one black and one brown shoe.

A short time after the shooting, Williams was apprehended as he walked in a river nearby. A large amount of coins, as had been described by Mr. Loomis, were found on Williams. Also, he had a fresh bullet wound in his shoulder.

 Thus, even if the prosecutor's comment was improper (and I feel it was ambiguous, rather than clearly improper), I believe that any error was harmless beyond a reasonable doubt. Honest, fair–minded jurors would hardly likely have acquitted the defendant even if the prosecutor had not made the remark complained of. See *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

5. The petitioner alleges that he was denied a speedy trial within the intendment of the Sixth Amendment to the U.S. Constitution. The Nevada Supreme Court overturned his 1968 conviction and sentence on January 16, 1975, on the ground that he had a right to a mental competency hearing prior to trial. His retrial did not commence until January 5, 1976.

The record reveals that a State District Court judge ordered mental examination of Williams on March 25, 1975, April 8, 1975 and December 9, 1975. The reasons such repeated orders were necessary was that Williams refused to answer questions of the psychiatrists or to otherwise cooperate with them. The judge, on June 30, 1975, ordered a stay of the proceedings until the question of mental competency to stand trial had been resolved. This was essential in that the law of the case was that a hearing and finding as to mental competency was required before Williams could be made to

stand trial. Also, the petitioner insisted upon changing attorneys, with attendant delay.

 Delay resulting from examination of the defendant and hearings on his mental competency do not violate his right to a speedy trial. *United States v. Allsup*, 573 F.2d 1141 (9th Cir. 1978), cert. den. 436 U.S. 961, 98 S.Ct. 3081, 57 L.Ed.2d 1128 (1978). In fact, the Speedy Trial Act itself excludes any delay resulting from determination of the mental competency of the defendant in computing the time within which trial must commence. 18 U.S.C. § 3161(h)(1)(A). For delay to be unconstitutional, it must be purposeful or oppressive on the part of the prosecution. *United States v. Ewell*, 383 U.S. 116, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966).

 Here, virtually all of the delays resulted from the actions of the petitioner himself. Under such circumstances, he has not been denied a speedy trial. See *Harrison v. United States*, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968).

6. Finally, the petitioner contends that he was denied a fair trial because two police officers testified that they thought Williams was being tried on an habitual criminal charge, and because the prosecuting attorney from the 1968 robbery trial testified at the 1976 trial that the 1968 jury had found Williams guilty of the same robbery he was being tried for in 1976.

Reno Police Sergeant Merle Kennedy testified as a witness for the prosecution in the 1976 trial. On direct examination he testified that he had been one of the officers who had stopped Williams on the street shortly after the robbery, and described the questioning and shootout. On cross–examination Williams' attorney emphasized to Sergeant Kennedy that Williams was being tried for robbery and not for attempted murder or assault and battery. In answer to further questioning by Williams' attorney, Sergeant Kennedy said he had not been advised of the nature of the charges against Williams in the trial then going on. Upon the prosecutor's objection of irrele-

vance, that line of questioning was dropped. Nevertheless, a few moments later Williams' attorney asked: "Now, at the last trial what was the charge?" Sergeant Kennedy answered: "I believe he was tried for habitual. I'm not certain."

Later in the trial, Reno Police Officer Brian Milich testified as a witness for the prosecution. He said that he responded to a call for assistance based on an officer being shot and the flight of the suspect. Two boys pointed out the location of a black man hiding under a bridge over the Truckee River. Officer Milich and another officer arrested the man, who was Williams. Williams' wound and the coins found on his person were described by Officer Milich. He also identified the clothes that had been found in Williams' valise. On cross—examination, Williams' counsel questioned Officer Milich about the amount of money found on Williams and whether the officer had any personal knowledge of the robbery. Then the following dialogue ensued (Reporter's Transcript pp. 210–211):

"A In other words, did I observe the robbery in fact? No, I didn't.

"Q Okay. Do you know of any events occurring at 8:30 in the evening at the Loomis residence?

"A I did hear it over the radio.

"Q Very good. So everything you told us happened after 9:00 o'clock, at 9:00 and thereafter?

"A The assistance call would have to come in before 9:00 but it was around 9:00 o'clock that I made the arrest.

"Q Very good. Do you know what this man is charged with today?

"A I believe I do.

"Q And what is that?

"A Habitual criminal.

"Q And so you are here testifying because you believe he was charged with habitual criminal?

"A That's what I think he is charged with. I haven't been informed.

"Q And the testimony you are giving is, of course, in accord with your belief that he is charged with being a habitual criminal?

"A Will you—

"THE COURT: Counsel, I'm going to interject here. I am going to instruct—another witness testified concerning habitual criminal and I am going to instruct the jury to disregard that testimony, disregard that testimony and disregard questions of counsel concerning that. The testimony of the witness of what he thinks the defendant is charged with I don't think is relevant and those questions are not to be considered—not to be considered by the jury and you are strongly admonished to ignore any testimony concerning that."

Herbert F. Ahlswede, Esq. later was called as a witness for the prosecution. He had been the prosecuting attorney in Williams' 1968 robbery trial. On direct examination he was questioned about the money admitted into evidence during that trial. Mr. Ahlswede disclosed that after the 1968 trial he had obtained the money from the Clerk's office and given it to Mr. Loomis. On cross—examination Williams' attorney questioned the witness regarding the difference in the amount of money allegedly taken from Mr. Loomis by the robber and that recovered from Mr. Williams when he was apprehended. Then the following colloquy took place (Reporter's Transcript pp. 224–225):

"BY MR. DEAN (counsel for Mr. Williams):

"Q In any event, you did not return those coins to the man sitting over there, Billy Williams, did you?

"A No, they were not his.

"Q· Were they taken from him originally?

"A Yes.

"Q And who decides whether or not the coins belong to Billy Williams?

"A In my mind the jury did when they found him guilty in the last trial.

"Q But we are here today and in accord with your knowledge and experience and in accord with your expertise as Chief Deputy, Washoe County, where are the coins he is accused of taking?

"A I returned them to Mr. Loomis.

"Q When you try a case or when you tried the case, don't you usually present the evidence to the jury?

"A Yes, and the evidence was presented to the jury in the first case.

"Q Can you present the evidence to this jury?

"MR. PERRY: Your Honor, I am going to object again.

"THE WITNESS: I gave the coins—

"THE COURT: All right. Mr. Ahlswede, there's an objection.

"MR. PERRY: It is an improper question. First of all, it is argumentative, secondly and finally, it is my function as the attorney for the State, not Mr. Ahlswede's, to present evidence in this case and Mr. Ahlswede has explained why that evidence is not here.

"THE COURT: I'll sustain the objection.

"MR. PERRY: Thank you.

"MR. DEAN: No more questions of this witness, Thank you.

"THE COURT: All right. Ladies and gentlemen of the jury, I would like to admonish you at this time that as you were previously instructed that the fact there was a previous trial in this matter is not to be considered by you in determining the guilt or innocence of the defendant and the reason that the matter was sent back for trial the second time is not to be considered or speculated by you and that you are to disregard Mr. Ahlswede's statement that there was a guilty finding in the prior trial. All right."

 Where allegedly prejudicial evidence was elicited by the defendant, he has the burden of establishing that he was unfairly treated. *Barbara v. Johnson*, 449 F.2d 1235 (6th Cir. 1971), cert. den. 405 U.S. 922, 92 S.Ct. 958, 30 L.Ed.2d 793 (1972); *United States v. Branan*, 457 F.2d 1062 (6th Cir. 1972); see also *Fish v. Cardwell*, 523 F.2d 976 (9th Cir. 1975), cert. den. 423 U.S. 1062, 96 S.Ct. 801, 46 L.Ed.2d 654 (1976). Further, it is necessary that this burden be sustained not as a matter of speculation but as a demonstrable reality. *United States v. Branan*, supra.

■ As discussed above, the evidence of guilt against Williams was very strong. In addition, the trial judge's instructions to the jury to ignore the references to habitual criminal and the prior robbery conviction tended to cure any error. See *Barbara v. Johnson*, supra; *United States v. Belperio*, 452 F.2d 389 (9th Cir. 1971); *Johnson v. United States*, 424 F.2d 537 (9th Cir. 1970). Therefore, the burden of establishing unfair treatment has not been sustained by the petitioner.

From the foregoing, I rule that the petitioner's assertions do not establish a prima facie case of constitutional error. There are no factual disputes. Even if all his allegations are assumed to be true, he is not entitled to a writ of habeas corpus. Therefore, no evidentiary hearing need be afforded him. Cf., *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). The petition for a writ of habeas corpus should be denied.

Let an order dismissing the petition be entered.